750 A.2d 177 (2000)
330 N.J. Super. 545
STATE of New Jersey, Plaintiff-Respondent,
v.
Oscar CARABALLO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted April 12, 2000.
Decided May 9, 2000.
*179 Wronko, O'Hara & Miller, Somerville, for defendant-appellant (Gilbert G. Miller, of counsel and on the brief).
John J. Farmer, Jr., Attorney General, for plaintiff-respondent (H. John Witman III, Deputy Attorney General, of counsel and on the brief).
Before Judges BAIME, BROCHIN and EICHEN.
*178 The opinion of the court was delivered by BAIME, P.J.A.D.
Defendant appeals from convictions for two counts of murder (N.J.S.A. 2C:11-3a), possession of a firearm for an unlawful purpose (N.J.S.A. 2C:39-4a), and possession of a handgun without a permit (N.J.S.A. 2C:39-5b). We reverse because: (1) two key prosecution witnesses were required to testify although they refused *180 to take an oath or make an affirmation to tell the truth, (2) prejudicial hearsay testimony was improperly admitted, and (3) defendant was denied the effective assistance of counsel.

I.
This case concerns the senseless killing of two young adults in the course of a street confrontation. Defendant, Pedro Burgos, Luis Marin, Osvaldo Gonzalez and Raymond Feliciano were on their way to a dance club when they encountered Antonio Monteiro, Jorge Silva and two other individuals. Defendant made a derogatory comment because Monteiro was wearing a Halloween mask. According to Feliciano, as he and Burgos attempted to intercede, defendant pushed them aside and fired two or three shots from a small chrome handgun. Monteiro was killed instantly. Silva was transported to a nearby hospital where efforts to resuscitate him were unsuccessful.
Richard Marrero encountered defendant approximately twelve hours after the shootings. Defendant confided that he had "caught two bodies," meaning that he had killed two people. Marrero and defendant were longtime friends, and Marrero had seen defendant in his home with a firearm sometime before or after the incident. Marrero described the weapon as a.25 caliber automatic handgun. Although the murder weapon was never recovered, ballistics evidence indicated that both victims died from gunshots from a .25 caliber pistol.
In his statement to the police and again at trial, Feliciano gave a graphic and detailed account of the killings, naming defendant as the shooter. Burgos, Gonzalez and Marin had given statements to the police essentially corroborating Feliciano's description of the incident and identifying defendant as the sole perpetrator. All three individuals were called as prosecution witnesses. We describe what transpired in some detail.
Burgos took the stand as the State's first witness. In the presence of the jury, Burgos refused to either swear on the Bible or affirm his intention to tell the truth. While noting that she had the power to hold Burgos in contempt, the trial judge decided not to take that course. She instead directed Burgos to "answer [the questions] truthfully." Burgos then attempted to invoke his Fifth Amendment privilege. The trial judge refused to accept Burgos' assertion of his right to remain silent and again ordered him to testify. Before any questions were propounded, the judge told the jury that it was to be "mindful of the fact that [Burgos] ha[d] [neither] taken an oath [n]or made an affirmation," but he nonetheless was required to testify.
In direct examination, Burgos responded to questions concerning his name, age, incarceration for robbery, and friendship with defendant. The examination deteriorated when he was asked about his statement to the police, which he disavowed. Following a hearing out of the jury's presence, the judge found that Burgos' statement to the police was made in "circumstances establishing its reliability" and was admissible as substantive evidence under N.J.R.E. 803(a)(1). See State v. Gross, 121 N.J. 1, 577 A.2d 806 (1990).
Gonzalez was the next witness. He took the same tack as Burgos with respect to the administration of the oath. Like Burgos, he refused to swear, affirm or otherwise promise to tell the truth. When asked directly whether he "promise[d] to tell the truth," Gonzalez replied that he would "not." The judge nevertheless directed Gonzalez to testify.
Gonzalez was no more forthcoming than Burgos. Gonzalez repeatedly responded to the prosecutor's questions by noting that he did not want to "cooperate" and that he was in "fear for his life." The witness admitted that he had given a statement to the police. But he never expressly supported or repudiated the part of the *181 statement in which he named defendant as the shooter.
Unlike the case with Burgos, the judge never conducted a hearing to determine whether Gonzalez's statement to the police was admissible under N.J.R.E. 803(a)(1). No inquiry was conducted to determine whether the statement was inconsistent with Gonzalez's trial testimony and whether it was made under reliable circumstances. The statement itself was never introduced into evidence. However, the prosecutor repeatedly paraphrased the statement, inquiring of Gonzalez whether "that [was] what [his] statement said." Gonzalez either refused to respond at all to these questions or merely indicated that the prosecutor had accurately read or paraphrased the statement. The jury was thus made aware of the essential facts contained in Gonzalez's statement even though it was never formally offered or admitted in evidence.
The oath was properly administered to Marin. Marin testified that he was intoxicated at the time of the shooting and could not identify the perpetrator. When confronted with his statement to the police, Marin responded that he had lied to deflect suspicion from himself. The prosecutor did not offer Marin's statement into evidence. Nor did the trial court conduct a hearing to determine whether it was made under reliable circumstances and thus qualified as an inconsistent statement admissible as substantive evidence. However, the essential gist of the statement including Marin's identification of defendant as the shooterwas clearly brought to the attention of the jury.
We add for the sake of completeness that defendant's trial attorney sat idly by throughout the proceedings. She did not interpose an objection when Burgos and Gonzalez were permitted to testify without taking an oath or making an affirmation of their intention to tell the truth. Nor did she object to the prosecutor's narratives pertaining to the statements given by Gonzalez and Marin to the police. The prosecutor was thus given an open sesame to the admission of tainted evidence. We will return to this subject shortly.

II.
We hold that the trial court committed reversible error when it required Burgos and Gonzalez to testify after they refused to be sworn or make an affirmation as to their intention to tell the truth. The judge's enigmatic instruction to the jury that it was to be "mindful" of the witnesses's refusal to take the oath compounded, rather than alleviated, the prejudice resulting from this error.
N.J.R.E. 603 requires that all prospective witnesses be sworn or affirmed. Neither that rule nor any other specifies any particular form to which an oath must adhere. This silence is in sharp contrast to the explicit manner prescribed for the making of affirmations or declarations set forth in N.J.S.A. 41:1-6. The absence of any specific form of oathas well as N.J.R.E. 603's reference to "an" oath, as opposed to "the oath," demonstrates that the rule was intended to validate any oath ceremony acceptable at common law. In re R.R., 79 N.J. 97, 108, 398 A.2d 76 (1979).
At common law, oaths originally constituted "a mode of proof" rather than a method of enhancing credibility. Ibid. "An accused could be cleared of all charges merely upon the sworn testimony that he had not perpetrated an offense." Ibid. (citing 6 Wigmore on Evidence §§ 1815-16 at 380-83 (Chadbourn Ed.1976)). The concept of testimony under oath gradually underwent a change of character. Ibid. Instead of constituting a form of evidence, courts came to conceive of the oath as a vehicle for strongly reminding a witness of his duty to tell the truth and the punishment in store for him should he testify falsely. Ibid. Originally, the punishment envisioned by the oath was to come from a vengeful Deity. State v. Levine, 109 N.J.L. 503, 506-07, 162 A. 909 (Sup.Ct.1932). *182 Thus, a witness could not be sworn and could not testify unless he believed in a Supreme Being who would punish him should he lie. Ibid.
The early common law's requirement that a witness must believe in a Deity in order to testify has been abandoned in all American jurisdictions. In re R.R., 79 N.J. at 109, 398 A.2d 76 (citing 6 Wigmore on Evidence § 1828 at 414-32). Both N.J.R.E. 603 and N.J.S.A. 41:1-6 allow the making of affirmations or declarations by those who do not believe in God or are conscientiously scrupulous against swearing in His name. While we no longer rely on divine and supernatural retribution as a sanction for lying in court, the oath or affirmation required of a witness nevertheless constitutes a strong reminder that he has a special obligation to testify truthfully and that he is subject to punishment should he fabricate. In re R.R., 79 N.J. at 110, 398 A.2d 76. The ceremony in whatever form must embrace the commitment to tell the truth out of fear of punishment. Ibid.; see also State v. Zamorsky, 170 N.J.Super. 198, 204, 406 A.2d 192 (App.Div.1979); State v. Gambutti, 36 N.J.Super. 219, 224, 115 A.2d 136 (App.Div.1955).
We do not view the oath or affirmation as an empty gesture. If the proposed witness refuses to either take an oath or make an affirmation, he should not be allowed to testify. Biunno, Current N.J. Rules of Evidence, Comment on N.J.R.E. 603 (1999). The trial court thus erred by requiring Burgos and Gonzalez to testify despite their refusal to be sworn or make an affirmation. The judge's reminder to the jury that the witnesses had refused to take an oath enhanced the potential for prejudice. It is to be emphasized that the unsworn testimony Burgos and Gonzalez gave at trial did not help prove the State's case. However, their unsworn testimony provided the prosecutor with a vehicle to introduce evidence relating to the witnesses' out-of-court statements in which they unequivocally identified defendant as the perpetrator. The message implicit in the judge's reminder that the witnesses refused to take an oath or make an affirmation was that the out-of-court statements were true and the trial testimony was false. We are satisfied that defendant was deprived of a fair trial.

III.
We also find that testimony relating to the out-of-court statements of Burgos, Gonzalez and Marin was erroneously admitted. The State argues that Burgos' declaration was admissible as an inconsistent statement, that Gonzalez's statement was merely used to refresh his recollection, and that Marin's statement was introduced to neutralize his trial testimony. These arguments lack merit.
The trial court admitted Burgos' out-of-court statement under N.J.R.E. 803(a)(1). That rule allows the admission of a witness's inconsistent statement as substantive evidence. The rule provides in pertinent part as follows:
The following statements are not excluded by the hearsay rule:
(a) Prior statements of witnesses. A statement previously made by a person who is a witness at trial or hearing, provided it would have been admissible if made by the declarant while testifying and the statement:
(1) is inconsistent with the witness' testimony at the trial or hearing and is offered in compliance with Rule 613. However, when the statement is offered by the party calling the witness, it is admissible only if, in addition to the foregoing requirements, it (A) is contained in a sound recording or in a writing made or signed by the witness in circumstances establishing its reliability or (B) was given under oath subject to the penalty of perjury at a trial or other judicial, quasi-judicial, legislative, administrative or grand jury proceeding, or in a deposition; or ....
*183 The State asserted that Burgos's statement to the police was "inconsistent with the witness' trial testimony" and was made under "circumstances establishing its reliability." We agree that Burgos' statement was "inconsistent" because it deviated from his assertions on the witness stand. Also, Burgos feigned a lack of recollection regarding the facts contained in his prior statement. See State v. Brown, 138 N.J. 481, 540, 651 A.2d 19 (1994); State v. Bryant, 217 N.J.Super. 72, 77-79, 524 A.2d 1291 (App.Div.), certif. denied, 108 N.J. 202, 528 A.2d 24, cert. denied, 484 U.S. 978, 108 S.Ct. 490, 98 L.Ed.2d 488 (1987); State v. Burgos, 200 N.J.Super. 6, 10-12, 490 A.2d 316 (App.Div.), certif. denied, 101 N.J. 304, 501 A.2d 961 (1985).
As we have pointed out, however, Burgos should not have been permitted to testify because he refused to take an oath or make an affirmation. To that extent, his assertions from the witness stand cannot fairly be characterized as "testimony" under N.J.R.E. 803(a)(1). "`Testimony' is generally defined as a particular kind of evidence that comes to a tribunal through live witnesses speaking under oath or affirmation...." State v. Williams, 182 N.J.Super. 427, 432, 442 A.2d 620 (App.Div.1982) (citing Black's Law Dictionary 1324 (5th ed.1979); Webster's Third New International Dictionary, 2362 (3d ed.1971)). The issue is more than one of semantics. Burgos was merely a passive vehicle used by the prosecutor to place before the jury an otherwise hearsay declaration.
Gonzalez's out-of-court declaration was also inadmissible. We reject as a mere facade the State's contention that Gonzalez's out-of-court statement was used to refresh his recollection. Gonzalez refused to cooperate. He did not fail to recall.
The applicable legal principles were discussed by our Supreme Court in State v. Carter, 91 N.J. 86, 449 A.2d 1280 (1982). There, the Court said that "[o]nce a proper foundation has been laid, a witness may examine any document to refresh his memory." Id. at 122, 449 A.2d 1280. The trial court must first "decide whether the memorandum does refresh the witness' recollection." Id. at 123, 449 A.2d 1280. "It may decline to permit its use where the danger of undue suggestion outweighs the probable value of the evidence." Ibid. The point stressed by the Court was that "[t]he admissible evidence is the recollection of the witness, and not the extrinsic paper." Ibid. "The test is whether the witness puts before the court his independent recollection and knowledge." Ibid. (citing Zimmer v. Westinghouse Elec. Corp., 26 N.J. 339, 351, 139 A.2d 754 (1958)).
The trial judge has a duty to prevent a witness from putting into the record the contents of an otherwise inadmissible writing under the guise of refreshing recollection. See United States v. Scott, 701 F.2d 1340, 1346 (11th Cir.), cert. denied, 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 158 (1983); Thompson v. United States, 342 F.2d 137, 140 (5th Cir.), cert. denied, 381 U.S. 926, 85 S.Ct. 1560, 14 L.Ed.2d 685 (1965); Delaney v. United States, 77 F.2d 916, 917 (3d Cir.1935). On its face, the procedure utilized by the trial court here violated defendant's right of confrontation because it admitted testimony relating to "a devastating, out-of-court statement by a witness which did not fall within one of the hearsay exceptions." State v. Williams, 226 N.J.Super. 94, 102, 543 A.2d 965 (App.Div.1988). The judge clearly erred in allowing the prosecutor to "continue a line of questioning which placed before the jury innuendo evidence or inferences of evidence" which the State could not otherwise have produced. Id. at 103, 543 A.2d 965. In propounding questions, a prosecutor may not merely parrot a statement ostensibly used to refresh recollection. See Lautek Corp. v. Image Bus. Sys. Corp., 276 N.J.Super. 531, 546, 648 A.2d 488 (App.Div.1994). That is what occurred here.
*184 Finally, we conclude that the trial court erred by admitting testimony pertaining to Marin's out-of-court statement. We are entirely unpersuaded by the State's argument that this statement was used merely to "neutralize" Marin's inconsistent trial testimony. The State's reliance on N.J.R.E. 607 is clearly misplaced. That rule provides as follows:
Except as otherwise provided by Rules 405 and 608, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence relevant to the issue of credibility, except that the party calling a witness may not neutralize the witness' testimony by a prior contradictory statement unless the statement is in a form admissible under Rule 803(a)(1) or the judge finds that the party calling the witness was surprised. A prior consistent statement shall not be admitted to support the credibility of a witness except to rebut an express or implied charge against the witness of recent fabrication or of improper influence or motive and except as otherwise provided by the law of evidence.
Initially, we regard as disingenuous the prosecution's claim that it was "surprised" by Marin's testimony. After Burgos' and Gonzalez's failure to cooperate, it was predictable that Marin would repudiate his statement to the police. State v. Guido, 40 N.J. 191, 191 A.2d 45 (1963) sets forth the procedure to be used when a proponent becomes aware that a witness will not adhere to a prior statement, but feels the disavowal should be tested under oath. He should so inform the court at side bar. Id. at 200, 191 A.2d 45. The witness should then be examined in the absence of the jury. Ibid. Only so much of his testimony as is not neutralized may then be repeated in the presence of the jury. Ibid. Had this procedure been followed, none of Marin's out-of-court statement would have been placed before the jury.
But even assuming that the prosecutor had no inkling that Marin would disavow his prior statement, we would be required to reverse. The appropriate procedure is described in State v. Gallicchio, 44 N.J. 540, 210 A.2d 409 (1965). When a proponent has no indication that a witness will repudiate his prior statement and is truly surprised by the contradictory testimony given, the trial court must take prompt action to insure fairness. At side bar, the court must decide whether the party has a prior statement of the witness which is truly contradictory to his present testimony, whether the party is without prior knowledge that the witness would testify contrary to such prior statement, and whether the present testimony is prejudicial or detrimental to the proponent's case. Id. at 547-48, 210 A.2d 409. Its findings, if favorable to the proponent, should not be revealed to the jury. Id. at 548, 210 A.2d 409. Upon finding that the requisite elements are present, the trial court should permit the prior statement to be used, instructing the jury contemporaneously as to its effect. Ibid. The jury should be instructed that it may consider the prior statement in deciding whether to believe the testimony which the prior statement contradicts. Ibid. The trial court should strongly emphasize that in no event is the jury to consider the prior statement as proving the truth of the matter therein stated. Ibid. At the conclusion of the case, the jury should again be instructed on this point. Ibid.; see also State v. Johnson, 216 N.J.Super. 588, 608-09, 524 A.2d 826 (App.Div.1987).
Neutralization means "the erasure or cancellation of unexpected harmful testimony by a showingeither by cross-examination or by other witnessesthat the witness has made a statement in conflict with his present testimony." State v. Gallicchio, 44 N.J. at 545, 210 A.2d 409. The distinction between substantive and impeachment evidence in the context of an *185 inconsistent statement is a subtle point, but one that is important. Here, Marin was a mere empty vessel. His testimony was worthless to the prosecution. His appearance was for the sole purpose of bringing before the jury an out-of-court statement with no proof of its underlying reliability. No limiting instruction was given to the jury. We are convinced that the error so committed was capable of producing an unjust result.

IV.
We are constrained to add that defendant was denied the effective assistance of counsel. Defendant's trial attorney did not interpose an objection when Burgos and Gonzalez were permitted to testify without being sworn or making an affirmation. She sat idly by when the prosecutor introduced devastating, inadmissible hearsay evidence. Her cross-examination of the prosecution witnesses was ineffectual and apparently without effort.
We have said that once appointed or retained, counsel "becomes bound to fully and faithfully serve the interests of his client within the boundaries of professional ethics." State v. Velez, 329 N.J.Super. 128, 132, 746 A.2d 1073 (App.Div.2000). The rule plainly envisages the effective assistance of counsel in his professional capacity. Ibid. "[N]o true justice system could be satisfied with pro forma fulfillment of a guarantee as important as the right to counsel where there has been no actual assistance rendered." State v. Clark, 260 N.J.Super. 559, 562, 617 A.2d 286 (App.Div.1992).
The bench mark for judging ineffective assistance of counsel claims is whether the defense attorney's professional errors "materially contributed" to the jury's verdict. State v. Fritz 105 N.J. 42, 58, 519 A.2d 336 (1987). We recognize the strength of the State's case. But even against that backdrop, there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1984). The errors committed[1] undermine our confidence in the outcome of the trial.
Accordingly, defendant's convictions are reversed and the matter is remanded for a new trial.
NOTES
[1] Counsel's gross inattention to our rules of practice was carried over to the appellate process. Defendant's trial attorney filed a notice of appeal in his behalf but never filed a brief, despite our orders requiring her to do so. We ultimately were forced to refer her lack of diligence to the ethics committee. In sharp contrast, defendant's substituted attorney, Gilbert Miller, promptly prepared and filed a thorough brief raising the issues that we have resolved in this opinion.