**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1207-24

WAYNE S. RYERSON,

      Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
TEACHERS' PENSION AND
ANNUITY FUND,

      Respondent-Respondent.

_____

Submitted April 28, 2026 – Decided May 14, 2026

Before Judges Chase and Augostini.

On appeal from the Board of Trustees of the Teachers' Pension and Annuity Fund, Department of the Treasury, Agency Docket No. TPAF No. xx4432.

Anthony Scordo, PC, attorney for appellant (Anthony Scordo, III, on the brief).

Jennifer Davenport, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Yi Zhu, Deputy Attorney General, on the brief).

PER CURIAM

Petitioner Wayne Ryerson appeals from the November 15, 2024 final agency decision of the Board of Trustees ("Board") of the Teachers' Pension and Annuity Fund ("TPAF") which denied his application for ordinary disability retirement benefits finding he is not totally and permanently disabled from the performance of his duties. We affirm.

I.

Petitioner is seventy-three years old. He obtained a Bachelor's and Master's in speech pathology and worked for eighteen years, starting in 1981, as a speech therapist. In 1999, he enrolled in TPAF incident to his employment with the Orange City Board of Education. While his employment title changed over the years, Ryerson was "basically [employed as] . . . a 'speech therapist' for school children, diagnosing and treating children's speech disorders and collaborating with parents and teachers."

At the onset of his employment, and for approximately fourteen years thereafter, petitioner worked in the Preschool Intervention and Referral Specialist program. In 2017, he was reassigned to work with the elementary and middle schools. As such, his new assignment required him to come and go from various school buildings while carrying students' files, booklets, and

2

instructional materials. According to petitioner, the buildings he was assigned to lacked elevators; therefore, when he was assigned to classrooms on middle or upper floors, he had to carry the items up and down several flights of stairs.

His new position—though his general duties were roughly the same—required him to work with groups of students, not individuals, and carry more instructional materials. He was sometimes able to take multiple trips with his instructional materials, and on occasion he used a rolling cart.

Ryerson's Medical History

In 2002, Ryerson was struck by a car while crossing the street as a pedestrian and injured his neck. He underwent an MRI and treated with physical therapy. His neck issues "persisted . . . [and] got worse and worse . . . as [he] got older."

In April 2006, Ryerson had a laminectomy[1] performed by Dr. Gamache due to radiating lower back pain, which caused numbness. Despite the procedure offering him short term relief, eventually all his symptoms returned.

---

[1] A "[l]aminectomy is surgery to remove the back arch or part of a spinal bone." It is intended to "ease pressure on the spinal cord or nerves." See Mayo Clinic Staff, Laminectomy, Tests & Procedures, Laminectomy - Mayo Clinic (July 25, 2024).

A-1207-24

Between 2010 and 2018, Ryerson was under the care of Dr. Lawler for neck and back pain. Dr. Lawler administered steroidal injections and prescribed narcotics for pain management; however, he stopped prescribing narcotics and discharged Ryerson in May 2018. Thereafter, Ryerson began treatment with Dr. Alladin, who sent him for physical therapy and chiropractic adjustments, prescribed pain medication, administered spinal injections, and performed nerve ablation procedures.

In early 2019, petitioner went to Pro Staff Institute Physical Therapy for a Functional Capacity Evaluation ("FCE").[2] Based on the results of the FCE, Dr. Alladin concluded that petitioner was experiencing severe disability. Further, according to Dr. Alladin, the FCE results showed that Ryerson: (1) could only occasionally reach above shoulder level and climb stairs; (2) had a diminished ability to walk; and (3) should not be doing repetitive kneeling, squatting, or bending. However, the FCE expressly notes that Ryerson "demonstrated consistent effort throughout 41.2% of this test which would

---

[2] "A FCE is a series of tests that help evaluate your physical abilities. The tests have you pull, push, lift, and complete other tasks . . . ." See Johns Hopkins Medicine, Functional Capacity Evaluations, Physical Medicine and Rehabilitation, Functional Capacity Evaluations | Johns Hopkins Physical Medicine and Rehabilitation (last visited Apr. 15, 2016).

A-1207-24

suggest significant observational and evidenced based contradictions resulting in consistency of effort discrepancies, self-limiting behaviors, and/or submaximal effort."

In February 2019, petitioner filed his first application for ordinary disability benefits. He then submitted four more applications, with varying retirement dates. When he returned to work in the Fall of 2020, he was surprised, despite choosing a July 2020 retirement date, to learn that the Board of Education ("BOE") had retired him.

Pursuant to petitioner's applications for ordinary disability, the TPAF arranged for him to be evaluated by Dr. Hutter. In June 2020, Dr. Hutter physically examined Ryerson and reviewed his medical records. Dr. Hutter diagnosed Cervical and Lumbar spondylosis,[3] and concluded, given his "benign objective orthopedic examination[,]" and because he was still working at the time of the examination, that Ryerson was "not totally and permanently disabled

---

[3] "Spondylosis is a general term for age-related wear and tear affecting the spinal disks in your neck" and "is very common and worsens with age. More than 85% of people older than age 60 are affected." See Mayo Clinic Staff, Cervical Spondylosis, Diseases & Conditions, Cervical spondylosis - Symptoms & Causes - Mayo Clinic (Sept. 19, 2025).

from the performance of the full duties of his job as a speech and language pathologist."

In September 2020, the TPAF Board denied Ryerson's application for ordinary disability. The Board determined he was "not totally and permanently disabled from the performance of [his] regular and assigned duties pursuant to N.J.S.A. 18A:66-39 and relevant case law." The Board did, however, determine that Ryerson qualified for a "service retirement benefit."

At the Board's January 2021 meeting it approved petitioner's request for a hearing and determined the matter was "contested." The matter was referred to the Office of Administrative Law ("OAL"), and an administrative law judge ("ALJ") was assigned. Before the ALJ, there were significant delays regarding submission of expert reports. Pursuant to petitioners' "failure to produce a medical expert to testify . . . [,]" TPAF moved for a summary decision. The ALJ granted TPAF's motion and the Board adopted the ALJ's decision and affirmed denial of Ryerson's application. Ryerson then appealed.

The parties participated in our Civil Appeals Settlement Program ("CASP"). As a result, a May 2023 consent order was entered dismissing the appeal without prejudice and remanding the matter back to the OAL as a contested case.

A-1207-24

In July 2023, Dr. Hutter submitted an addendum to his report. After reviewing additional medical records, he reaffirmed his conclusion that Ryerson was not totally and permanently disabled.

On remand, the ALJ heard testimony on three dates between January and February 2024. Petitioner "requested that the ALJ recuse himself having determined that the appeal was dismissed with prejudice, thus imposing the ultimate sanction, and that determination was reversed and remanded on appeal." The ALJ did not recuse himself.

Petitioner presented testimony from himself and Dr. Alladin, and respondent presented testimony from Dr. Hutter. The ALJ made findings regarding each witness' testimony.

As to petitioner, the ALJ determined: (1) there was an overall lack of evidence to support his claims; (2) evidence of his pain and limitations were "entirely subjective"; (3) his testimony and credibility were undermined because, although the "'physical demands' section of the job description . . . [contained] the proviso that reasonable accommodations can be sought[,]" petitioner produced no evidence that he sought accommodations, that any requests were denied, or that he sought assistance from his union to receive

7

accommodations; and (4) despite bearing the burden of proof, petitioner proffered merely "bare verbal assertions."

Dr. Alladin's testimony was found to be inconsistent with his narrative report which "detract[ed] from his credibility." His credibility was further undermined because, despite asserting that petitioner was totally disabled, he conceded that petitioner could continue to work if accommodations were made regarding the distances he had to walk, amount of materials he had to carry, and number of stairs he needed to climb. Lastly, the ALJ determined that Dr. Alladin's narrative report "detract[ed] from, if not completely undermine[d], [petitioner's] case[]" because it did not contain a statement that his medical conclusions were made with a "reasonable degree of medical certainty (or probability)[.]"

In contrast, the ALJ found Dr. Hutter to be credible and noted that his testimony disproved petitioner's testimony. Further the ALJ found that the FCE, which was supposed to be helpful to petitioner's case, was undermined by Dr. Hutter highlighting concerns of petitioner's "submaximal effort[.]"

The ALJ then found: (1) petitioner's pain complaints, which began in 2017 after he was assigned to the elementary and middle schools, were primarily related to lifting, carrying, and walking instructional materials up and down

stairs; (2) lifting and carrying instructional materials were not essential to the elements of petitioner's position and were instead, "incidental[;]" (3) petitioner's testimony was unconvincing and not credible given his failure to produce sufficient credible evidence, seek union assistance in receiving accommodations, and/or file a worker's compensation action; (4) based on in court observations and petitioner's admissions, Dr. Alladin did not review petitioner's job description prior to testifying and, therefore, could not "render an informed medical conclusion about whether petitioner was" disabled; (5) the FCE report indicated petitioner was malingering and "attempt[ing] to skew the test results[;]" (6) petitioner's testimony regarding the FCE was inconsistent with the FCE report which evidenced "that [petitioner was] not a fully credible witness[;]" and (7) petitioner was not totally disabled given he admitted to a willingness to continue working if he could do so remotely and indeed continues to operate a private speech pathology practice. As a result of those findings, the ALJ concluded petitioner did not establish an incapacity to perform the duties of his employment and thus, is ineligible for ordinary disability retirement benefits.

9

Petitioner did not submit exceptions to the ALJ's decision. On November 15, 2024, the Board adopted the ALJ's decision and affirmed denial of petitioner's application for ordinary disability. This appeal follows.

II.

Our review of decisions by administrative agencies is limited, with the party challenging the validity of the administrative action carrying a substantial burden of persuasion. In re Stallworth, 208 N.J. 182, 194 (2011). Under our standard of review, an agency's determination must be "sustained 'unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011) (quoting In re Herrmann, 192 N.J. 19, 27-28 (2007)). Thus, on appeal, our role is limited to the evaluation of three factors:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;
>
> (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and
>
> (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of relevant factors.

[Herrmann, 192 N.J. at 28 (quoting Mazza v. Bd. of Trs., Police & Firemen's Ret. Sys., 143 N.J. 22, 25 (1995)).]

When the agency's decision satisfies those criteria, we are obliged to afford substantial deference to its expertise and superior knowledge of a particular field, even if we would have reached a different result from that reached by the agency. Ibid. (citations omitted); see also In re Taylor, 158 N.J. 644, 657 (1999) (citations omitted).

While we are not bound by an agency's interpretation of legal issues, which we review de novo, Russo, 206 N.J. at 27 (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)), "[w]e must give great deference to an agency's interpretation and implementation of its rules enforcing the statutes for which it is responsible." Piatt v. Bd. of Trs., Police & Firemen's Ret. Sys., 443 N.J. Super. 80, 99 (App. Div. 2015) (quoting St. Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 13 (2005)). "Such deference has been specifically extended to state agencies that administer pension statutes." Ibid. (citing Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 196 (2007)).

"The Board has ultimate authority . . . to adopt, reject[,] or modify" an ALJ's findings. N.J. Dep't of Pub. Advoc. v. N.J. Bd. of Pub. Utils., 189 N.J. Super. 491, 507 (App. Div. 1983) (citing In re License of Suspension of

Silberman, 169 N.J. Super. 243, 255-56 (App. Div. 1979)). See N.J.S.A. 52:14B-10(c) (requiring the Board to "state clearly the reasons for" rejecting the ALJ's findings). Deference is particularly appropriate when the Board has adopted the findings of the ALJ because the ALJ has the opportunity to hear "live testimony" and "judge the witnesses' credibility." Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587 (1988). The Board must defer to the ALJ on the credibility of a lay witness, unless the Board "determine[s] from a review of the record that the findings are arbitrary, capricious or unreasonable or are not supported by sufficient, competent, and credible evidence in the record." In re Adoption of Amends. to Ne., Water Quality Mgmt. Plan, Upper Raritan, Sussex Cnty., 435 N.J. Super. 571, 584 (App. Div. 2014) (second alteration in original) (quoting N.J.S.A. 52:14B-10(c)).

III.

A.

We begin with petitioner's assertion that the ALJ's factual and credibility findings were arbitrary, capricious, and constituted an abuse of discretion. We disagree.

Under N.J.S.A. 18A:66-39, ordinary disability retirement benefits may be conferred when a member of TPAF "is physically or mentally incapacitated for

12

the performance of duty and should be retired." Ibid. "The applicant for ordinary disability retirement benefits has the burden to prove that he or she has a disabling condition and must produce expert evidence to sustain this burden." Bueno v. Bd. of Trs., Teachers' Pension & Annuity Fund, 404 N.J. Super. 119, 126 (App. Div. 2008). The applicant must show that the disabling condition is total and permanent. See Patterson v. Bd. of Trs., State Police Ret. Sys., 194 N.J. 29, 42 (2008) (noting that the standards "total and permanent disability" and "physically and mentally incapacitated" have been used interchangeably by our Supreme Court, and that the only meaningful distinction between the two standards is that an ordinary disability applicant does not need to show a work connection); Bueno, 404 N.J. Super. at 122.

Further, under N.J.A.C. 17:3-6.1(g)(3), "[t]o qualify for disability retirement, a member must be unable to perform his or her regular and assigned duties due to a permanently disabling medical condition present at the time of application[.]" Critically, the applicant also must "at a minimum prove an 'incapacity to perform duties in the general area of his ordinary employment' for other employers and may even be required to prove 'inability to perform substantially different duties or . . . produce evidence of general physical [or mental] unemployability[.]'" Bueno, 404 N.J. Super. at 131 (quoting Skulski v.

13

Nolan, 68 N.J. 179, 206 (1975)).   Total and permanent disability "is an extraordinarily high threshold that culls out . . . all cases in which a member can continue to work in some other capacity."  Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 195 (2007).

The Board's determination was based on substantial credible evidence in the record and was not arbitrary and capricious.  The ALJ did not find petitioner credible because his assertions were not rooted in substantial credible evidence.  For example, the FCE evidence produced by petitioner and upon which his expert heavily relied, expressly notes:   (1) petitioner only demonstrated "consistent effort throughout 41.2% of [the] test"; (2) "self-limiting behaviors and/or sub-maximal effort"; and (3) that "the overall results of this evaluation do not represent a true and accurate representation of this client's overall physical capabilities."   Additionally, the ALJ was correct that the "physical demands" of petitioner's job were incidental.  Petitioner also failed to prove he sought accommodation for his perceived disability.  Thus, petitioner could not prove whether he is totally disabled from performance of his duties because there is no evidence of what accommodations may, or may not, be available to him if he continued working.  Particularly, where both petitioner and his expert

14

admit that his ability to discharge his duties would improve if distance traveled, stairs climbed, and weight carried were lessened.

The ALJ provided detailed reasoning as to why he placed more significant weight on the testimony provided by the Board's expert as opposed to that of the petitioner. Given the deference accorded to such determinations, we find no error.

B.

We are also not persuaded by petitioner's argument that the ALJ abused his discretion by imposing discovery sanctions. Specifically, petitioner asserts that he complied with the discovery rules concerning Dr. Alladin. Moreover, petitioner claims it was a mistake to not allow his expert, Dr Alladin, to refresh his recollection with certain documents that were not produced in discovery.

Evidentiary rulings are entitled to deference absent a clear abuse of discretion or error in judgment. Belmont Condo. Ass'n, Inc. v. Geibel, 432 N.J. Super. 52, 95-96 (App. Div. 2013); Verdicchio v. Ricca, 179 N.J. 1, 34 (2004); Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999). Rulings on evidence "must stand unless it can be shown that the trial court palpably abused its discretion." State v. Carter, 91 N.J. 86, 106 (1982). Under the abuse of discretion standard of review, reversal is only appropriate in cases where the

15

trial court's finding was "so wide of the mark that a manifest denial of justice resulted." Ibid.

The ALJ did not abuse his discretion in excluding the records Dr. Alladin was referring to because: (1) respondent requested the documents in discovery, never received them, and was entitled to see the records first; (2) there was no showing that Dr. Alladin needed his recollection refreshed; and (3) petitioner was effectively committing "trial by ambush" and it would be inequitable to permit the expert to use documents that were requested but not produced.

During proceedings before the ALJ, the judge excluded documents demanded by respondent in discovery but not produced by petitioner. The Rules require a party answering interrogatories, to: (1) produce expert reports and the documents the expert relied on to make their decision, R. 4:17-4(e); (2) execute HIPAA forms authorizing disclosure of medical records to the requesting party, R. 4:17-4(f); and (3) produce documents that are in their possession, custody, or control, R. 4:18-1(a)(1).

This accords with the long-standing notion that "'[t]he discovery rules were designed to eliminate . . . concealment and surprise.'" Abtrax Pharms. v. Elkins-Sinn, 139 N.J. 499, 512 (1995) (quoting Oliviero v. Porter Hayden Co., 241 N.J. Super. 381, 387 (App. Div. 1990)). Lastly, underpinning this issue is

16

the important function expert reports serve—to provide the opposition "with notice of the facts and opinions to which the physician will testify, and permit[] that party to assess the need for additional discovery and for medical testimony at trial." Delvecchio v. Township of Bridgewater, 224 N.J. 559, 582-83 (2016).

Although petitioner claims that he executed HIPAA release forms and informed respondent that there were certain documents not in his possession, which respondent would need to subpoena, each form only permits disclosure to petitioner's attorney—not TPAF or its counsel. The record makes clear that the HIPAA release forms were insufficient. Respondent had no means of subpoenaing the information. Additionally, despite respondent's request for production, petitioner never identified Dr. Alladin as a treating physician, did not produce Dr. Alladin's treatment records, and did not disclose the facts and data Dr. Alladin considered. Therefore, the ALJ was within his discretion to limit Dr. Alladin's testimony to what was produced.

Moreover, a witness' review of a document, for purposes of refreshing their recollection under N.J.R.E. 612, does not, per se, make the document or its contents admissible. See State v. Rajnai, 132 N.J. Super. 530, 540-41 (App. Div. 1975). So too, it is impermissible to introduce the contents of a record, which would be otherwise inadmissible, under the guise of refreshing

recollection. State v. Caraballo, 330 N.J. Super. 545, 557 (App. Div. 2000). Exclusion of documents used to refresh recollection is proper where the document is inadmissible and cannot meet other hearsay exceptions. Importantly, the transcript indicates Dr. Alladin was "reading from" the document; an action which has been expressly rejected by this Court. See Lautek Corp. v. Image Business Sys. Corp., 276 N.J. Super. 531, 546 (App. Div. 1994) ("A witness may not merely parrot a statement used to refresh recollection, thus making admissible a portion of a document that itself may be inadmissible").

C.

Lastly, we have no basis to overturn the ALJ's denial of petitioner's motion to recuse. After the initial appeal was filed the parties attended CASP and agreed to a dismissal of the appeal without prejudice with the matter being remanded back to the OAL as a contested case. There was no prejudice to the case going to the same ALJ. To the extent we have not specifically addressed petitioner's remaining arguments concerning bias, it is because they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(e).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1207-24